IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| AMY C. FRARY, | CASE NO. 4:22-cv-00674-JRA |
| Plaintiff, | DISTRICT JUDGE JOHN R. ADAMS |
| vs. |  |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Amy C. Frary filed a Complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court reverse the Commissioner's decision and remand for further proceedings consistent with this Report and Recommendation.

**Procedural background**

*Previous application.* In October 2016, Frary filed applications for disability insurance benefits and supplemental social security income that

alleged a disability onset date of August 13, 2013.[1] Tr. 76. In March 2019, Administrative Law Judge (ALJ) Reuben Sheperd issued a written decision finding that Frary was not disabled and determining that she had the residual functional capacity (RFC)[2] to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional reaching overhead, bilaterally; frequent handling/fingering, bilaterally; frequent climbing ramps and stairs; never climbing ladders, ropes or scaffolds; no unprotected heights, dangerous machinery, commercial driving; able to perform simple routine tasks and make simple work-related decisions; limited to frequent interactions with supervisors, co-workers and the public; tolerates few changes in the routine work setting.

Tr. 80, 85.

*Present application.* In October 2019, Frary filed the applications for disability insurance benefits and supplemental social security income that are at issue in the instant matter, alleging a disability onset date of March 29, 2019. Tr. 234-235, 242. Frary claimed that she was disabled due to rheumatoid arthritis, depression, anxiety, diabetes, Sjögren's Syndrome,[3] fibromyalgia,

---

[1]    "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm's of Soc. Sec.*, 193 F. App'x 422,425 (6th Cir. 2006).

[2]    An RFC is an "assessment of" a claimant's ability to work, taking his or his "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

[3]    Sjögren's Syndrome is a chronic autoimmune disorder that causes insufficient moisture production in certain glands of the body, including those

memory issues, obesity, fatigue, and pain. Tr. 118. In December 2019, she amended her applications to include pain in her hips, knees, and feet. *Id.* The Commissioner denied Frary's applications at the initial level and upon reconsideration. Tr. 129–137, 141–147. Frary requested a hearing before an ALJ, adding a recent diagnosis of sleep apnea in her request. Tr. 148–149.

In March 2021, ALJ Charles Shinn held a hearing at which Frary and vocational expert Gail Klier testified. Tr. 36–62. One week later, ALJ Shinn issued a written decision finding that Frary was not disabled. Tr. 14–28. Frary appealed. Tr. 231–232. ALJ Shinn's decision became final in March 2022, when the Appeals Council declined further review. Tr. 1–3, *see* 20 C.F.R. § 404.981. Frary filed this action in April 2022. Doc. 1.

**Factual background**

*Personal and vocational evidence.* Frary was born in 1971 and was 48 years old on the date of her alleged disability onset.[4] Tr. 93, 95. Frary has a high school education. Tr. 42–43. She used to work for the State of Ohio answering telephone calls from her home. Tr. 44–45.

---

that produce saliva and tears. *Sjögren's Syndrome*, The Cleveland Clinic Health Library, Diseases & Conditions (last visited Jan. 31, 2023), https://my.clevelandclinic.org/health/ diseases/4929-sjogrens-syndrome.

[4]    To be entitled to disability insurance benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled before the end of his or her insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Soc. Sec. Disab. Claims Prac. & Proc.* § 5:3 (2nd ed. 2022).

*Physical health evidence.*[5] In February 2019, Frary sought emergency medical treatment for a cough and hyperglycemia. Tr. 529–549. Matthew D. Eggleston, D.O., assessed her and determined that she had influenza. Tr. 533. Once Frary received fluids and breathing treatments, Dr. Eggleston discharged her with a prescription for Tamiflu and an inhaler. Tr. 533–534.

In March 2019, Frary had an appointment with rheumatologist Fabio V. Ochoa, M.D., who was treating Frary for rheumatoid arthritis, Sjögren's Syndrome, uncontrolled diabetes mellitus, and vitamin D deficiency. Tr. 614. Each time Frary had an appointment with Dr. Ochoa, she completed a questionnaire focused on her symptoms during the previous week. Tr. 608–610, 611–613, 614–616. During her March 2019 appointment, Frary reported a half hour of stiffness daily and rated her pain as a "6" out of 10, slightly higher than moderate. Tr. 614. The questionnaire asked Frary to categorize the level of difficulty that she experienced completing certain daily activities. Tr. 610, 613, 616. She reported "some difficulty" standing up from a straight chair, walking outdoors on flat ground, reaching for and retrieving a five-pound object from just above her head, and running errands and shopping. Tr. 616.

In April 2019, Frary saw podiatrist Darleen Abadco, D.P.M., for Type II diabetes mellitus with neuropathy,[6] edema, hammer toes, a pre-ulcer in her

---

[5]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

[6]    Diabetes-related neuropathy is a type of nerve damage that affects people with diabetes. *Diabetes-Related Neuropathy*, The Cleveland Clinic

left foot, equinus[7] in her left lower extremity, and plantar fasciitis in the left

foot. Tr. 643–644. Dr. Abadco observed that Frary had diminished sensation to

sharp and dull stimuli, as well as tightness in her calf muscles that prevented

full motion in her ankles. Tr. 643. Dr. Abadco found Frary's strength to be

normal, her reflexes intact, and noted that Frary had full vibratory sensation.

*Id*. Frary reported pain in the arch of her left foot and pain when Dr. Abadco

palpitated that foot. *Id.*

In June 2019, Frary had a follow-up appointment with Dr. Ochoa during

which he reviewed x-rays of Frary's upper and lower extremities. Tr. 633. The

images revealed osteopenia[8] in the joints of her left and right hands, left wrist,

and left foot; decreased joint space[9] in her right hand, right knee, left knee,

---

Health Library, Diseases & Conditions (last visited Jan. 31, 2023),
https://my.clevelandclinic.org/health/diseases/21621-diabetic-neuropathy.
Symptoms include burning or shooting sensations, increased sensitivity to
pain, numbness or weakness, slow-healing foot or leg sores called ulcers,
tingling, or total loss of sensation in the foot. *Id.*

[7]    Equinus is a podiatric condition caused by tightness in the Achilles
tendon or calf muscle that results in a lack of flexibility in the ankle joint and
limits the upward, toes-to-shin movement of the foot (dorsiflexion). *Equinus*,
Shoreline Orthopaedics, Foot & Ankle (last visited Jan. 31, 2023),
https://www.shorelineortho.com/specialties/foot_ankle_equinus.php.

[8]    Osteopenia is a loss of bone mineral density with no signs or symptoms;
a clinician can conduct a strength test to screen for it. *Osteopenia*, The
Cleveland Clinic Health Library, Diseases & Conditions (last visited Jan. 31,
2023), https://my.clevelandclinic.org/health/diseases/21855-osteopenia.

[9]    Joint space narrowing occurs when cartilage becomes worn, often due to
age, and is no longer able to keep bones apart at a normal distance. *Everything
You Should Know About Joint Space Narrowing*, Healthline (last visited Jan.
31, 2023), https://www.healthline.com/health/joint-space-narrowing.

and left shoulder; a cyst on her femur; and a deformity in her left foot. *Id*. On Dr. Ochoa's questionnaire, Tr. 611–613, Frary reported one hour of stiffness daily and all-day fatigue. Tr. 611. She rated her pain as a "6" out of 10, slightly higher than moderate. *Id*. She reported "some difficulty" standing up from a straight chair and reaching for, and retrieving, a five-pound object from just above her head. Tr. 613.

One week later, Frary sought emergency medical treatment for swelling in her left knee that she claimed she had been experiencing for 10 years. Tr. 369. Andrea A. Hastings, M.D., assessed Frary and noted that there was a "minimal to no diameter difference" between Frary's left knee as compared to her right. Tr. 372. Dr. Hastings ordered an MRI and recommended physical therapy. Tr. 372. Frary also complained of fatigue with "general malaise" that waxed and waned and was mild in severity. Tr. 369–370. Dr. Hastings ordered blood tests to check for iron deficiency and indicated that the fatigue was likely a result of Frary's diabetes and lifestyle factors. Tr. 370, 372.

In mid-July 2019, technicians at Mercy Health-St. Elizabeth's Youngstown Hospital conducted the MRI of Frary's knee that Dr. Hastings had ordered. Tr. 485. The results showed mild degenerative changes in the bones of Frary's left leg. Tr. 486, 487.

Also in July 2019, Carmelita Reyes, D.P.M., became Frary's primary podiatric care provider. Tr. 641. Frary met with Dr. Reyes every nine weeks thereafter. Tr. 639, 640, 641, 907, 1255.

In August 2019, Frary sought emergency medical treatment for hypoglycemia. Tr. 428. The notes from this visit record a history of uncontrolled diabetes. Tr. 427. Frary reported taking her insulin as directed but admitted that she was not as consistent with a second medication she had been prescribed to help maintain her blood sugar. Tr. 589.

In September 2019, Frary had a follow-up appointment with Dr. Ochoa. Tr. 608. On Dr. Ochoa's questionnaire, Tr. 608–610, Frary reported two hours of stiffness daily and all-day fatigue. Tr. 608. She rated her pain as a "7" out of 10, moderate to severe. Tr. 610.  She reported "some difficulty" standing up from a straight chair, getting in and out of bed, climbing up five steps, reaching for, and retrieving, a five-pound object from just above her head, and getting in and out of the car. *Id*.

At the end of September 2019, Frary had a follow-up appointment for uncontrolled diabetes and hyperthyroidism with her endocrinologist Saira Varghese Mammen, M.D. Tr. 874. Frary acknowledged that she had been inconsistent with her insulin, especially at night, and admitted that she often ate just two meals a day because her chronic pain made her fall asleep before dinner. *Id*. Dr. Mammen observed that Frary had diminished sensation to vibration. *Id*.

In March 2020, Frary had a follow-up appointment with Dr. Mammen, during which Frary reported that her glucose levels had been high for the past few weeks. Tr. 950. Dr. Mammen increased Frary's dose of insulin. Tr. 950.

7

In May 2020, Frary was diagnosed with sleep apnea. Tr. 1020.

In June 2020, Frary had a follow-up appointment with Dr. Mammen during which Frary complained of numbness and tingling in her lower legs and feet. Tr. 1129.

In August 2020, Frary saw ophthalmologist Tac Z. Lee, M.D., for a diabetic eye exam. Tr. 1246. Dr. Lee diagnosed Frary with advanced diabetic eye disease[10] in her left eye and bilateral, age-related cataracts. Tr. 1252.

In October 2020, Frary saw her primary care doctor for shoulder pain. Tr. 1287. Christian E. Yeasted, M.D., suggested Frary lose weight and start physical therapy for her shoulder. *Id.*

A few days later in October 2020, Frary had a follow-up appointment with Dr. Mammen during which Frary reported intermittent hypoglycemia; Dr. Mammen attributed this to Frary's inconsistent eating. Tr. 1339.

In January 2021, Ralph J. Rothenberg, M.D., became Frary's primary provider of rheumatology care. Tr. 1375. Dr. Rothenberg found that Frary had dry eyes and a dry mouth consistent with Sjögren's Syndrome but noted that Frary said she did not find the dry mouth a "major problem" and hadn't been treating her dry eyes with drops or medication. *Id.* Dr. Rothenberg observed

---

[10]     Dr. Lee recorded the diagnosis as "proliferative diabetic retinopathy," which is an advanced stage of diabetic eye disease marked by the growth of new blood vessels that bleed, impeding vision with dark spots or blocking it entirely. *Diabetic Retinopathy: Causes, Symptoms, Treatment*, American Academy of Ophthalmology (last accessed Jan. 31, 2023), https://www.aao.org/eye-health/diseases/what-is-diabetic-retinopathy.

limited motion in Frary's left shoulder but noted that it was not tender. Tr. 1377. Frary reported decreased sensation in her mid-feet. Tr. 1378.

In February 2021, Frary had a follow-up appointment with Dr. Rothenberg. Tr. 1366–1370. Dr. Rothenberg expressed to Frary the extent to which her neuropathy and diabetic eye disease complicated his ability to effectively address her diabetes. Tr. 1366. Frary said that because she was severely nearsighted, "no one" would address her retinal issues. *Id*. Dr. Rothenberg observed the limitation in Frary's left shoulder which he again noted was not tender. Tr. 1369. Frary reported decreased sensation in her mid-feet. *Id*. Dr. Rothenberg observed crepitus in Frary's knees but noted a good range of motion without warmth or soft tissue swelling. *Id*. He diagnosed Frary with bilateral primary osteoarthritis of the knee for which he suggested she use a brace and take naproxen. Tr. 1370. Rothenberg wrote that Frary's Type II diabetes mellitus with hyperglycemia "clearly" warranted more aggressive treatment because her blood sugar level remained out of control despite the prescription of several medications intended to maintain it. *Id*.

*Mental health evidence.* In January 2019, Frary began seeing nurse practitioner Lori Funkhouse for psychiatric medication management. Tr. 667-754.

In April 2019, Frary met with counselor Mario Laluz for a psychiatric diagnostic assessment in preparation for psychotherapy. Tr. 693–698. During the assessment, Mr. Laluz found that Frary's demeanor was preoccupied, her

9

mood was anxious and depressed, her affect was flat, and her behavior was withdrawn. Tr. 693–695. Frary acknowledged suicidal ideation but denied having a plan or intent, and denied having a history of self-harm. *Id.* Mr. Laluz observed Frary to be well-groomed and of above average intelligence. Tr. 694. He found her thought processes logical and her activity, speech, thought content, and cognition normal. Tr. 693-695. Frary began seeing Mr. Laluz regularly for psychotherapy. Tr. 1029–1098, 1265–1280.

In late April 2019, Frary had an appointment with Nurse Funkhouse during which she reported having passive suicidal thoughts a "few days ago" but "none since." Tr. 734. She rated her depression as a "9" out of 10 though she indicated that her therapy sessions with Mr. Laluz were helping. *Id.* Nurse Funkhouse found Frary's mood depressed and her thought processes illogical. Tr. 735, 736. Nurse Funkhouse described Frary's memory as intact, her judgment as fair, and her attention, affect, and speech normal and appropriate. Nurse Funkhouse increased the dosage of Frary's antidepressant medication and advised her to go to the emergency room if her condition declined. Tr. 737.

Frary had an appointment with Nurse Funkhouse in September 2019 during which she reported that medication improved her depression. Tr. 750. Frary said that her depression was "always there" and rated it as a "5" out of 10. *Id.* Nurse Funkhouse found that Frary's mood was anxious and her affect flat, but she described Frary's speech, judgment, insight, thought processes, memory, and concentration as normal and appropriate. Tr. 751.

In December 2019, nurse practitioner Zach Aldridge became Frary's primary provider of psychiatric medication management. Tr. 999–1003. Frary reported sleeping excessively. Tr. 999. She described her depression as severe. *Id*. She said she had racing thoughts, complained of "excessive worry," and admitted having suicidal ideation, though she denied having a plan or intent. *Id*. Frary mentioned that she had been unemployed since March 2019 and that her depression tended to get worse during times of financial stress. *Id*. She explained that she suffered from seasonal depression which usually worsened during the winter. *Id*. Nurse Aldridge changed Frary's antidepressant medication. Tr. 1002. He noted that Frary's mood was depressed and her affect constricted. Tr. 1000, 1001. He described Frary's speech, thought processes, associations, insight, judgment, concentration, and attention as normal. *Id*.

In April 2020, during an appointment with Nurse Aldridge, Frary raised her feelings of isolation due to the global pandemic and the resulting negative effect on her mood. Tr. 1014. She reported fleeting suicidal ideation but denied having a plan or intent. *Id*. Nurse Aldridge found Frary's mood anxious and depressed. Tr. 1015, 1016. He described her speech, thought processes, judgment, insight, memory, and concentration as normal. *Id*.

In August 2020, Frary sought emergency medical treatment for nausea and, during the intake process, mentioned having suicidal ideation. Tr. 55, 1136. Joseph Noga, D.O., conducted a psychiatric evaluation during which Frary acknowledged daily suicidal ideation since childhood, though she denied

having a plan or intent. *Id*. Frary described her thoughts as "persistent, moderate in severity, and worsened by nothing." *Id*.  Dr. Noga found that Frary's affect was depressed and described her thought processes as "coherent and congruent." Tr. 1139.

In October 2020, Frary had an appointment with her primary care physician for shoulder pain, during which she reported having suicidal ideation. Tr. 1287. She intimated that she had experienced daily suicidal thoughts since the age of nine. Tr. 1287–1288, 1291.

During an appointment with Nurse Aldridge in February 2021, Frary reported improvement in her mood and a reprieve from seasonal depression. Tr. 1382. Nurse Aldridge found that Frary's speech, thought processes, associations, judgment, and insight were normal. Tr. 1383. He described her mood as euthymic.[11] Tr. 1384.

*State agency opinions*. In January 2020, Maureen Gallagher, D.O., reviewed the medical evidence and adopted the previous ALJ's determination of Frary's physical RFC from the March 12, 2019 written decision in which he denied Frary's previous applications. Tr. 80, 92–98. The previous ALJ had determined that Frary had retained the RFC to "perform light work except occasional reaching overhead, bilaterally; frequent handling/fingering,

---

[11]    Euthymia is used in psychiatry to describe the state of living without mood disturbances. *Euthymia and Bipolar Disorder*, Healthline (last visited Feb. 2, 2023), https://www.healthline.com/health/euthymic. A euthymic person has a calm and steady mood, and typically experiences feelings of cheerfulness and tranquility with an increased resilience to stress. *Id*.

bilaterally; frequent climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; no unprotected heights, dangerous machinery, [or] commercial driving." Tr. 80, 98. Dr. Gallagher indicated that she was adopting the prior ALJ's physical RFC, recited it verbatim, and wrote:

> The RFC given is an adoption of the RFC findings from the ALJ decision dated 3/12/2019 based on AR 98-4 (Drummond Ruling).
>
> Expedited RFC (DI 24510.066) and Inability to Sustain RFC (DI 24510.057) do not apply.
>
> The checkbox was selected as a systems workaround to complete medical assessments in compliance with the Drummond/Dennard ARs.

*Id.*

In May 2020, upon reconsideration, W. Scott Bolz, M.D., reviewed the medical evidence. Tr. 115–116. Dr. Bolz found that the RFC from Dr. Gallagher's initial assessment appeared consistent with the evidence and affirmed it at the reconsideration level. Tr. 116. Dr. Bolz acknowledged that Dr. Gallagher's physical RFC came from the prior ALJ's March 12, 2019 decision when he wrote in conclusion that:

> The RFC given is an adoption of the RFC findings from the ALJ decision dated 3/12/2019 based on AR 98-4 (Drummond Ruling).
>
> Expedited RFC (DI 24510.066) and Inability to Sustain RFC (DI 24510.057) do not apply.
>
> The checkbox was selected as a systems workaround to complete medical assessments in compliance with the Drummond/Dennard ARs.

Tr. 115–116.

In January 2020, Paul Tangeman, Ph.D., reviewed the medical evidence and adopted the prior ALJ's assessment of Frary's mental RFC at the initial level. Tr. 98–99. The prior ALJ had determined that Frary retained the mental RFC to perform simple routine tasks and make simple work-related decisions; limited to frequent interactions with supervisors, co-workers, and the public; tolerates few changes in the routine work setting. Tr. 80, 99. Dr. Tangeman indicated that he was adopting the prior ALJ's mental RFC, recited it verbatim, and wrote:

> The [mental] RFC given is an adoption of the [mental] RFC findings from the ALJ decision dated 3/12/2019 based on AR 98-4 (Drummond Ruling).

> Expedited RFC (DI 24510.066) and Inability to Sustain RFC (DI 24510.057) do not apply.

> The checkbox was selected as a systems workaround to complete medical assessments in compliance with the Drummond/Dennard ARs.

*Id*.

In May 2020, upon reconsideration, Karla Delacour, Ph.D., reviewed the evidence. Tr. 116. Dr. Delacour found that the mental RFC from Dr. Tangeman's initial assessment appeared consistent with the evidence and affirmed it at the reconsideration level. *Id*. Dr. Delacour acknowledged that Dr. Tangeman's mental RFC had come from the prior ALJ's March 12, 2019 decision when she wrote in conclusion:

> The [mental] RFC given is an adoption of the [mental] RFC findings from the ALJ decision dated 3/12/2019 based on AR 98-4 (Drummond Ruling).

Expedited RFC (DI 24510.066) and Inability to Sustain RFC (DI 24510.057) do not apply.

The checkbox was selected as a systems workaround to complete medical assessments in compliance with the Drummond/Dennard ARs.

*Id.*

*Hearing testimony.* Frary was represented by counsel when she testified before ALJ Charles Shinn at the hearing in March 2021. Tr. 36–62. She said she takes all of her prescribed medications as directed. Tr. 43. The ALJ asked her about 10 medications specifically—Lyrica, Cymbalta, cholesterol medication, Metformin, Jardiance, Lisinopril, Methotrexate, Naproxen, Lantus, and Humalog—and Frary affirmed that she takes each one. Tr. 43–44. Her stomach often gets upset after she takes her medications because there are so many. Tr. 44.

Frary discussed her diabetes, which is still uncontrolled. Tr. 45. Since she received her diagnosis in 2010, her glucose levels have always been very high. Tr. 46. The only time they are normal is if she does not eat "any food at all." *Id.*

Frary discussed her neuropathy, which affects both of her feet equally. Tr. 46–47. It feels like "pins and needles, like if you sat on your foot too long." Tr. 46. Sometimes, her neuropathy prevents her from standing up. *Id.* Other times, it causes her to fall. *Id.* Medication helps "about 80 percent" of the time, but isn't always effective, particularly during turbulent weather. Tr. 47. She wears orthotics. Tr. 47. On a good day, she estimates that she would be able

to stand for about an hour. *Id*. On a bad day, she would be limited to standing for a half hour or less. *Id*.

Frary discussed her rheumatoid arthritis. Tr. 48. Her previous rheumatologist indicated that her uncontrolled diabetes prevented him from treating her arthritis. *Id*. Her arthritis is most severe in her left knee, which has recently been swollen and painful, although the pain is intermittent. *Id*. Her arthritis limits the length of time she can sit because she has difficulty standing up if she sits for too long. Tr. 49. She would be able to sit for "probably three hours" on a good day and "less than one [hour]" on a bad day. *Id*. In addition to medication, she treats her arthritis by elevating her knee and taking hot baths. *Id*.

Frary discussed her fatigue and sleep apnea, Tr. 50, before moving on to her depression. Tr. 51. Frary attends regular psychotherapy sessions and takes medication that keeps her mood "pretty level." Tr. 51. There are periods throughout the year when her symptoms intensify, such as the winter months between Thanksgiving and her birthday in February. *Id*. Her symptoms include lack of motivation, sleeping "too much," crying "all the time," and "just [being] sad." Tr. 51–52. Once or twice a month, she is overwhelmed by a crying spell that "come[s] out of nowhere" and lasts for about 20 minutes; she copes by letting it pass or meditating. Tr. 52.

Frary lives alone and does not have children. Tr. 52, 54. She attends church but isn't able to attend online services. Tr. 53–54. If she is having a

16

good day, she might walk to the library to use the internet or pick up books. Tr. 52. With some difficulty, she does her own cooking and cleaning. Tr. 53, 55–56. Each month when Frary's food stamps arrive, a friend from church drives her to the store so that she can shop for groceries. Tr. 53. She does not have family in the area. Tr. 54. Her father lives out of state. *Id*. Her mother and brother also live out of state, though she does not have any communication with them. *Id*. She does not have friends except for "the lady from church" who takes her to get her groceries. *Id*.

Frary believes that she could perform her former job answering telephone calls for the State of Ohio on a full-time basis if she were able to work out of an office during typical business hours. Tr. 55.

Vocational expert Gail Klier testified after Frary. Tr. 56. The ALJ informed Ms. Klier that he would be adopting the prior ALJ's finding that Frary could not return to any past work and he did not ask Ms. Klier to opine on that issue. Tr. 57. Instead, the ALJ began with a series of hypothetical questions, asking first whether a hypothetical individual with the same age, education, and work experience as Frary could perform work if such an individual had the limitations assessed in the RFC determination described below. Tr. 58. Ms. Klier answered that such an individual could perform unskilled light work in positions such as a merchandise marker, counter clerk at a lunchroom or coffee shop, or office helper. Tr. 58–59.

Next, the ALJ asked Ms. Klier whether jobs exist for such an individual if that individual would be off task for 20 percent of each day on an ongoing basis. Tr. 59. Ms. Klier testified that an employee who is off-task 20 percent of each day exceeds the amount of time spent off-task that is acceptable to most employers so this would preclude such an individual from all work. *Id.*

Finally, the ALJ asked Ms. Klier whether such a hypothetical individual could perform any work if he or she would be absent an average of four days each month. Tr. 60. Ms. Klier testified that an employee who is absent four days out of each month exceeds the level of absenteeism that is acceptable to most employers so this would preclude such an individual from all work. *Id.*

### The ALJ's decision

ALJ Shinn made the following findings of fact and conclusions of law:

1. Frary meets the insured status requirements of the Social Security Act through December 31, 2024.

2. Frary has not engaged in substantial gainful activity since March 29, 2019, the alleged onset date. 20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*

3. Frary has the following severe impairments: obesity, osteoarthritis of the hands, feet, and knees, rheumatoid arthritis, Sjögren's syndrome, diabetes mellitus, right shoulder cuff tear and impingement post-surgical repair, major depressive disorder, personality disorder, and generalized anxiety disorder. 20 CFR 404.1520(c) and 416.920(c).

4. Frary does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix

18

1. 20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.

5. Frary has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can never climb ladders, ropes, or scaffolds but she can frequently climb ramps and stairs. She can occasionally reach overhead bilaterally. The claimant can frequently handle and finger bilaterally. She cannot work at unprotected heights or around dangerous machinery. She can do no commercial driving. The claimant can perform simple routine tasks and make simple work-related decisions. She is limited to frequent interactions with supervisors, co-workers, and the public. She can tolerate few changes in the work setting.

6. Frary is unable to perform any past relevant work. 20 CFR 404.1565 and 416.965.

7. Frary was born in 1971 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Frary subsequently changed age category to closely approaching advanced age. 20 CFR 404.1563 and 416.963.

8. Frary has at least a high school education. 20 CFR 404.1564 and 416.964.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Frary is "not disabled," whether or not Frary has transferable job skills. *See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2.

10. Considering Frary's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform. 20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a).

11. Frary has not been under a disability, as defined in the Social Security Act, from March 29, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 19–27.

**Standard for disability**

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

Frary alleges that the ALJ erred when he premised his analysis on the belief that he was bound by the prior ALJ's RFC finding, thus creating an undue procedural burden on Frary in violation of the Sixth Circuit's decision in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018). Doc. 9, at 1. The Commissioner argues that the *Earley* standard does not apply here because Frary's claim for benefits covers a period that is distinct from the period covered by her initial claim. Doc. 10, at 12. The Commissioner argues in the alternative that even if the *Earley* standard applies, the ALJ's adherence to *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997), was harmless error because the ALJ provided Frary's present application a "fresh look" and did not use the previous ALJ's RFC determination as a mandatory starting point. Doc. 10, at 12. In reply, Frary argues that it is "hard to imagine a clearer example of an ALJ considering a previous RFC finding to be a mandatory starting point" since ALJ Shinn expressly began his decision by "announcing that [the] prior ALJ's RFC finding was <u>binding</u> on him absent new and material evidence of changed circumstances." Doc. 11, at 1 (citing *DiLauro*

22

*v. Comm'r of Soc. Sec.*, No. 5:19-cv-2691, 2021 WL 1175415, at *3–4 (N.D. Ohio Mar. 29, 2021)).

In *Drummond*, the Sixth Circuit said that certain previous cases "clearly demonstrate that the principles of *res judicata* can be applied against the Commissioner. When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d at 842. The Social Security Administration adopted this ruling as Acquiescence Ruling 98-4(6).

But in *Earley*, the Sixth Circuit said that "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review. There is nothing in the relevant statutes to the contrary. And *res judicata* only 'foreclose[s] successive litigation of the very same claim.'" 893 F.3d at 933 ("a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994."). *Earley* entitles a claimant to review free of the presumption that a previous RFC remains a proper RFC for a subsequent claim. *See Nadjl v. Comm'r of Soc. Sec.*, No. 1:21-cv-01578-SL, 2022 WL 2820413, at *9–10 (N.D. Ohio July 8, 2022) (citations omitted); *Anthony L.M. v. Comm'r of Soc. Sec.*, No. 3:20-cv-00525, 2022 WL 10638159, at *3–4 (S.D. Ohio June 27, 2022); *DiLauro*, 2021 WL 1175415, at *3; *Ferrell v. Berryhill*, No. 1:16-cv-00050, 2019 WL 2077501, at *5 (E.D. Tenn. May 10, 2019).

23

The Sixth Circuit also said in *Earley* that "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, *albeit not binding*, consideration in reviewing a second application." 893 F.3d at 933 (emphasis added). An ALJ may "consider a previous ALJ's RFC" determination and "errs only when he considers the previous RFC a mandatory starting point for the analysis." *Gale v. Comm'r of Soc. Sec.*, No. 1:18-cv-00859, 2019 WL 8016516, at *5 (W.D. Mich. Apr. 17, 2019).

Frary's present claim is for March 29, 2019 through March 12, 2021. Tr. 17–28. This is a distinct period of time from that of her previous claim, which was for August 13, 2013, through March 12, 2019. Tr. 76–85. Under *Earley*, "each application is entitled to review." 893 F.3d at 933. Yet the ALJ in this case announced from the start that under *Drummond*, he was "bound" by the previous RFC determination. Tr. 17. That was error.

The Commissioner chides Frary for "argu[ing] without merit that the ALJ's citation to *Drummond* meant that the ALJ used the prior ALJ's RFC as a mandatory starting point for his analysis." Doc. 10, at 13. But the Commissioner basically asks the Court to ignore the ALJ's words, as if he didn't mean what he said. As noted, however, the ALJ thought it so important to note that he considered himself "bound" by the previous determination, that he started his decision by stating that:

> In accord with the holding in Drummond v. Commissioner, 126
> F.3d 837 (6th Cir. 1997), adopted by the Social Security

> Administration as Acquiescence Ruling 98-4(6), absent evidence of improvement in a claimant's condition, a subsequent Administrative Law Judge is *bound* by the findings of a previous Administrative Law Judge regarding the claimant's residual functional capacity. Therefore, because I find no change in the claimant's condition since the time of the prior decision, *I am bound to adopt the residual functional capacity finding from that opinion.*

Tr. 17 (emphasis added).

So whatever one is to make of the ALJ's analysis, according to his own explanation, he viewed Frary's case through the lens of the previous RFC determination. Indeed, the ALJ bootstrapped his reliance on the previous determination when he found "persuasive" state agency medical opinions which were themselves verbatim recitations of the previous ALJ's RFC determination. *See* Tr. 25 (ALJ decision); *see also* Tr. 98-99, 115-16 (state agency decisions).

**Conclusion**

For the reasons explained above, I recommend that the District Court reverse the Commissioner's decision and remand for further proceedings consistent with this Report and Recommendation.

Dated: February 6, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).